## SOUTHERN PAC. CO. v. ARNETT et al.

(Circuit Court of Appeals, Eighth Circuit. November 4, 1901.)

No. 1,481.

**1. CARRIERS—ACTION FOR INJURY TO PROPERTY IN SHIPMENT—PLEADING.**

A special contract exacted by a carrier is a defensive weapon to be used by the carrier when sued by the shipper for an alleged violation of duty against which it was designed to afford protection, and a shipper suing to recover damages for negligence, on account of which the carrier is liable notwithstanding the contract, is not required to declare upon such contract.

**2. SAME—ACTION FOR INJURY TO LIVE STOCK—EVIDENCE.**

On the trial of an action against a railroad company to recover damages for injuries to cattle in shipment, alleged to have been due to the fact that they were kept too long in the cars without rest or feed or water, caused in part by the slow speed of the train, testimony tending to show that the time made was unusually slow for a stock train, and that the bad condition of the cattle on arrival at their destination was due to neglect and bad treatment during the journey, is germane to the issues, and its admission not error, where, so far as it consisted of opinion, the witnesses were shown to be qualified by experience to express such opinions, either by having been in the railroad service or by dealing in cattle.[1]

**3. EVIDENCE—STATEMENTS OF THIRD PERSON—RES GESTÆ.**

Unsworn statements made by a third person, who acted as agent for plaintiffs in loading the cattle on the cars, as to their condition at the time, were not admissible as part of the res gestæ in support of a defense that the cattle were in an unfit condition for shipment when loaded, where there was no evidence to show that such person was authorized to bind plaintiffs by such statements.

**4. SAME—OPINIONS—QUALIFICATION OF WITNESS.**

As a defense to an action against a railroad company for injury to cattle alleged to have been due to their negligent handling in shipment, defendant pleaded that the cattle were in unfit condition when shipped, and that their injury was due to such fact. In support of such defense, defendant offered the testimony of witnesses shown to have had experience in raising and caring for cattle, and to have seen the cattle in controversy at the time of their shipment, to the effect that they were not in fit condition to stand transportation by rail from the point of shipment to the point of destination at the time of year when the shipment was made, owing to the fact that the shipment was from a warm climate to a much colder one, and over high ranges of mountains, and the effect of the cold would be injurious, and would cause them to become numb, and lie down in the cars, and be unable to get up. *Held*, that such testimony was pertinent to the issue, and its exclusion was error, although it did not appear that such witnesses had shipped cattle by rail, or had actual experience of the effect of such change of climate; their qualifications being sufficient to render their opinions admissible, and the weight to be given them being a matter for the jury to determine.

Caldwell, Circuit Judge, dissenting.

**5. CARRIERS—ACTION FOR INJURY TO STOCK IN SHIPMENT—INSTRUCTIONS.**

Instructions, in an action against a railroad company to recover damages for injury to cattle in shipment, considered and approved.

In Error to the Circuit Court of the United States for the District of Utah.

A. H. Arnett and J. C. Easton, the defendants in error, brought this action against the Southern Pacific Company, the plaintiff in error, to recover dam-

---

[1] Admissibility of evidence in actions for injuries to live stock, see note to Railway Co. v. Hall, 32 C. C. A. 146.

ages for injuries said to have been sustained by certain cattle belonging to them, while they were being transported by the defendant company over its railroad from Caliente, in southern California, to Ogden, in the state of Utah. The plaintiffs below averred, in substance, that they delivered to the defendant company at Caliente 517 head of mixed cattle and 103 head of calves, to be safely carried to Ogden, and that while in transit they were injured through the negligence of the carrier, and depreciated in value to the extent of $15 per head. They averred that the negligence of the defendant company consisted in its refusal to permit the plaintiffs to unload, feed, or rest the cattle while in transit between Caliente and Reno, in the state of Nevada; in the careless handling of the train of cars containing the cattle, by reason whereof the journey was unnecessarily delayed; in failing to start the train promptly after the cattle had been reloaded on the cars at Reno, Nev.; and in neglecting to transport the cattle within a reasonable time from Reno to Ogden, by reason whereof the cattle were kept confined in the cars while in transit between those points, without food, water, or rest, for a period of 42 hours, which delay led to great suffering and damage, and resulted in the loss by death of 15 of the herd.

To the foregoing complaint the defendant interposed an answer, wherein it averred the following facts: That the cattle in question were received on November 3, 1898, to be transported from Caliente, Cal., to Ogden, Utah, under the provisions of a special contract between the carrier and the shipper; that prior to the loading of the cattle on its train it had no opportunity for properly inspecting them, and ascertaining whether they were in a suitable condition for transportation; that the plaintiffs' agents who were at the time, and for a long time previously had been, in charge of the cattle, well knew when the cattle were loaded that they had suffered for a long time for want of sufficient food, and were poor and weak, and not in a suitable condition to endure the journey to Ogden, which fact was unknown to the carrier; that if said cattle had been in a proper condition for shipment when they were received and shipped they would not have been injured; that the plaintiffs negligently and recklessly caused the cattle to be shipped when they were aware that they were in an unfit condition for transportation; and that the alleged loss and damage incident to the journey was occasioned by the plaintiffs' own fault and negligence. As a defense to the charge contained in the complaint that the plaintiffs were not allowed to unload the cattle between Caliente, Cal., and Reno, Nev., the defendant interposed the following plea: That, by virtue of the special contract under which the cattle were carried, they were, while en route, under the special charge of three persons who were in the plaintiffs' employ, whose special duty it was to care for the cattle, and see that they had proper attention at the proper time, and whose duty it was to advise the defendant when the stock needed food and water; that when the cattle reached Sacramento, Cal., they had then been en route about 16 or 18 hours; that the plaintiffs' agents who were in charge of the stock, although advised that the cattle could only be unloaded at Reno, Nev., nevertheless insisted on going forward without unloading at Sacramento, by reason of which conduct the cattle were kept on the cars about 35 hours continuously between Caliente and Reno; and that, if the cattle sustained injury in consequence of not being unloaded and fed at Sacramento, such injury was due to the conduct of the plaintiffs' own agents, and to the bad condition of the cattle at the time they were received for shipment. With respect to the alleged delay in transporting the cattle from Reno to Ogden, the defendant averred that the run between those points was made in 34 hours and 55 minutes; that there was one hour's delay in starting after the cattle were reloaded; that, although the plaintiffs' agents who were in charge of the stock were advised of several intervening stations where the cattle could be unloaded and fed, they nevertheless insisted on going through from Reno to Ogden without unloading the stock, and that, by reason of such negligent conduct on the part of the plaintiffs' agents the cattle were damaged, and not by reason of any fault or neglect on the part of the defendant company. The trial below resulted in a verdict and a judgment against the defendant company in the sum of $5,081.25, to reverse which the defendant company has removed the record to this court by a writ of error.

Thomas T. Fauntleroy (Alphonso Howe and Cornelius H. Fauntleroy, on the brief), for plaintiff in error.

S. D. Catherwood (R. E. Shepherd and E. B. Critchlow, on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

From the foregoing analysis of the pleadings, it appears that it stood confessed at the trial that the cattle in question were kept loaded on the cars in making the journey from Caliente, Cal., to Reno, Nev., considerably more than 28 hours, the limit prescribed by an act of congress for keeping stock confined in cars while in transit (Rev. St. § 4386); that there was considerable delay in starting the train from Reno after the cattle had been reloaded and made ready to start from that station; that they were kept on the cars continuously at least 36 hours while being transported from Reno to Ogden, Utah; and that as a result of the trip some of the cattle died, all were more or less injured, and that the owners of the herd sustained a considerable loss. The principal defenses which the defendant company seems to have relied upon to shield itself from liability were these: That the cattle were in such a poor physical condition at the time of the shipment, which fact was unknown to the carrier, but was known to the shipper, that they could not have been transported for such a long distance without serious injury; and that whatever additional injury was sustained by their being kept in the cars beyond the period prescribed by law could not be recovered by the plaintiffs, because their being so kept was due to the plaintiffs' own fault, or to the fault of their agents who had the stock in charge. Much testimony was introduced at the trial tending to show the physical condition of the herd when the shipment took place, the various incidents of the journey, the causes which induced delay, the reasons why the cattle were not unloaded, watered, and fed more frequently, and who was responsible for the delay and the undue confinement of the cattle in the cars during the journey. The evidence on these points was somewhat conflicting, but the issues thus raised have been settled by the verdict of the jury. The principal questions discussed in the briefs and at the bar, which we are required to consider, relate to the admission and exclusion of evidence, and to the refusal of certain instructions which were asked by the defendant.

One of the first contentions on the part of the defendant company is that the trial court should have directed a verdict in its favor because the complaint which was filed by the plaintiffs counted upon a violation of the common law duties of the carrier, while the answer and the proofs disclosed that the cattle were transported under a special contract which relieved the carrier from some of its stringent common-law obligations. We do not find that any question of this sort was raised or discussed in the trial court, and, not having been

raised below, it is not open to discussion here. The action was brought by the plaintiffs in the ordinary form, the complaint alleging certain specific violations of duty on the part of the carrier, by reason whereof the plaintiffs had sustained damage. The defendant answered, pleading the existence of a special contract, and such immunity from its common-law obligations as it had thereby secured. It did not insist that the special contract relieved it from liability for the wrongful acts alleged in the complaint, if they had been done in the manner and form alleged, nor did it insist that the plaintiffs could only recover for such injury as they had sustained by declaring upon the special contract, and on that alone. While the defendant set forth the special agreement in its answer, the substance of its defense was that such damage as the plaintiffs had sustained they had themselves occasioned by offering unfit cattle for shipment, and by refusing to unload, feed, and water them at proper intervals, although they were afforded the requisite facilities for so doing. The point under consideration was not only not made below, but if it had been we are aware of no rule of law which requires a shipper who has made a special contract to declare upon it, when he contends that the carrier has been guilty of some neglect of duty on account of which he is liable notwithstanding the provisions of the contract. A special contract, when exacted by a carrier, is a defensive weapon, to be made use of by the carrier when sued by the shipper for any alleged dereliction of duty against which it was designed to afford protection.

The next proposition is that error was committed in permitting a witness by the name of Black, who was one of the men who had charge of the cattle on the trip from Caliente to Ogden, and who had followed the butchering business for many years, and in that capacity had had very much to do with cattle, to say that it took "a great deal longer to take this train" from Sacramento to Reno than any train "he had ever come over on the same road," and to say, further, that "26 to 28 hours is long enough to keep cattle on the cars without feed or water." The first of these statements was neither very important nor improper, while the witness' acquaintance with cattle and knowledge of their habits and powers of endurance was much greater than that of the average person, and qualified him to say, as he did in substance, that 26 or 28 hours' confinement of cattle on cars was long enough, because confinement for a longer period would wear them out, cause them to fall or lie down, and have a general bad effect. It can scarcely be claimed that the admission of this testimony constituted a reversible error.

The same view must be taken concerning several other exceptions to the admission of evidence. One witness who had been a railroad conductor was allowed to say that the run from Caliente to Ogden "was a very poor run"; and with relation to the blowing out of the cylinder head of an engine, which occurred during the trip, and occasioned considerable delay, to say further that such accidents sometimes happen on railroads, but are more apt to happen "with a poor class of engines."

Another witness (one of the plaintiffs), who was a cattle dealer of large experience, and who met and inspected the herd at Ogden on

its arrival, was allowed to testify, in substance, that the cattle had been on the cars and confined therein for such a length of time during the trip, and had been carried across such a country, that it would cause them to be in the bad condition in which he found them on their arrival at Ogden. He was also allowed to answer the question whether it was customary on other roads, like that of the defendant company over which he had shipped cattle, to run stock trains at as low a rate of speed as $15\frac{1}{2}$ miles per hour; there being testimony which tended to show that the train in question did not average a greater speed. The same witness was allowed to state that his experience with railroads had been that it was customary to give stock trains a right of way over all trains except passenger trains. He was not allowed, however, to answer a question propounded on his cross-examination as to whether he had made an estimate of his entire loss on the cattle in controversy, in a letter written to the defendant company. This latter question was excluded, apparently, because it called for the contents of a written document which was not at the time produced and exhibited to the witness.

Another witness, who was a cattle dealer of considerable experience, and who also saw the herd on its arrival at Ogden, was allowed to testify, in substance, that the bad condition of the cattle on their arrival was due to the fact that they "had been very badly handled, and perhaps misused on the cars."

To the action of the trial judge in all of the foregoing instances, and in some others of a similar character which we may have overlooked, exceptions were reserved, and have been argued on appeal. But we are unable to say that the action of the lower court was materially erroneous. The testimony was all germane to the various issues in the case, and, in so far as it consisted of opinions, it seems to have been elicited from persons who were well qualified by experience to express the same. It is manifest, we think, that the judgment below cannot be reversed because of the errors last enumerated, unless we are overtechnical in the application of the rules of evidence.

The special contract under which the cattle in question were transported provided, in substance, that any compensation for injuries claimed to have been sustained by the cattle while in transit should be adjusted between the parties on the basis of the declared or represented value of the stock at the time and place of shipment,—that is, at Caliente, Cal.,—and that the damages should not exceed the declared value. With a view of showing, in accordance with the provisions of the special contract, what would have been the market value of the cattle at Caliente, taking into account the alleged injuries which they had sustained during the trip on account of the defendant's negligence, a long hypothetical question, covering more than a page of the record, was propounded to one of the plaintiffs' witnesses, who was allowed to answer it notwithstanding an objection which was interposed by the defendant company. The objection was that the supposed facts as recited in the question were not fairly in accordance with the evidence which had been introduced by the plaintiffs. The question was not criticised in any other respect, nor did

counsel point out with any degree of clearness wherein the assumed incidents of the journey, the condition of the cattle, and the hardships which they had undergone were not in conformity with the proof on those points, as it had been elicited from the plaintiffs' witnesses. In framing the hypothetical question, the plaintiffs had the right, of course, to assume that their own witnesses had told the truth, rather than the defendant's witnesses, whenever there was any conflict; and while the question was long and involved, and while we may be permitted to doubt the expediency of allowing such complex questions to be propounded in a case of this character, yet we are not able to hold that the objection actually interposed was tenable. The question, in our judgment, contained a reasonably fair summary of all the material facts as they had at the time been testified to by the plaintiffs' witnesses.

The defendant company proposed to prove that while the cattle in controversy were being loaded on the cars at Caliente on November 3, 1898, one of the plaintiffs' agents, who was supervising the loading, declared "that he had been buncoed"; also that he said, in substance, that the cattle were not the cattle that had been bought in the field; and that he suspended the loading for a short time, and threatened to unload those that were already on the cars. These statements of the agent were excluded, and an exception was saved. The evidence consisted of unsworn declarations by a third party, who was not shown to have had any authority to bind the plaintiffs by making such statements concerning the condition of the cattle. Nor were they made under such circumstances that they can be regarded as admissible on the ground that they were the res gestæ of an act which the agent was then performing in behalf of his principal, nor was any foundation laid for introducing them in evidence for the purpose of impeaching the person by whom the statements are said to have been made. The proposed testimony was properly excluded, and the same may be said of the action of the trial court in excluding similar statements which the defendant sought to prove by another witness by the name of Byers, who claims to have been present when the cattle were loaded, and to have heard certain disparaging remarks concerning the condition of the cattle, which were made by persons who were at the time in charge of the herd, and were assising in the loading of the same.

Complaint is further made by the defendant because its chief train-dispatcher was not permitted to answer the question, "What care and diligence did the defendant exercise to prevent delay on the road in going forward and in overcoming any delay when it occurred?" But as the answer which the witness gave to that question was "that everything was done that could be done to prevent delay of this train in going forward and in overcoming any delay when it occurred," and as this was a mere conclusion of law on the part of the witness which embodied no statement of the facts on which the conclusion was based, it is manifest that no error was committed in excluding the question and the answer thereto.

The defendant company offered to read from the deposition of a witness by the name of S. J. Root, who testified that he helped to

load the cattle on the cars at Caliente; that he had had experience in raising, feeding, and transporting cattle all his life; and was then 58 years old, and had made cattle raising his principal business,—a statement to the effect that, in his judgment, the cattle in question had not been well enough fed, and were not in a fit condition when shipped, to stand transportation from Caliente to a cold climate; that the change of climate would be injurious to them, and cause them to become numb, and to lie down and be unable to get up. This statement was made in response to the question whether the change of climate in the month of November from Caliente to Ogden, Utah, or to Omaha, where the herd was eventually carried, would have any effect on the cattle in the condition that they were in, and, if so, what effect. The trial court excluded the answer to the question, and an exception was taken. It also refused to permit another witness, George E. Root, who was 30 years old, and had had much experience in raising, feeding, and in taking care of cattle, and who saw the herd loaded on the cars at Caliente, and was well acquainted with it for some time prior to the shipment, to testify, in effect, and in response to an interrogatory, that shortly before the shipment one of the cattle in the herd, a full-grown animal, had died in the pasture where the herd was kept, because, in his opinion, "he didn't get enough feed." It excluded another statement of the same witness, that shortly before the shipment the herd had been moved from one pasture to another because the feed in the former pasture had "given out entirely," and could "keep them no longer." It also refused to permit this witness to answer the question whether the cattle in controversy, when shipped, "were in a fit and safe condition to be transported for three or four days upon railroad cars." The trial court refused to allow another witness, W. H. Cuddy, who testified that he was acquainted with the herd, and had the care and management of cattle all his life, and was 33 years old, to answer a similar question as to whether, in his opinion, the cattle at the time of the shipment were in a condition to be safely transported by rail for such a long distance as they were actually carried. And it also declined to permit another witness, Henry Dubbers, who had had large experience in handling cattle, and who had seen and inspected the herd in question prior to the shipment, and found them, as he said, to be "weak and thin," to say, in response to the inquiry what effect a change of climate in November from Caliente to Ogden would have upon cattle which were poor and weak, that such a change of climate would be disastrous; that the herd, as he saw it, were so poor and ill fed that they could not resist the shock, and "would be numbed, even by frost." Proper exceptions were duly taken to the action of the court in each of the foregoing instances, and the exceptions have been urged in this court.

We are of opinion that each of the foregoing exceptions was well taken. The condition that the cattle were in when they were shipped was one of the principal issues in the case, inasmuch as the defendant contended that, through want of sufficient nourishment for some time prior to the shipment, the cattle were poor and weak, and incapable of withstanding the fatigue incident to a long journey by rail,

and the cold that was encountered in transporting them over the high mountain ranges between Caliente, in southern California, and Ogden, Utah. It contended, further, that the injuries complained of were not the result of any negligence on its part, but were due to the enfeebled condition of the cattle, and that they could not have been avoided by the exercise of that degree of care which the carrier was required to exercise. It is obvious that the excluded evidence tended to support these contentions, and we are unable to say that any of the witnesses from whom the testimony was elicited lacked the experience which was necessary to qualify them to testify as experts concerning the condition of the cattle, and the probable effect of transporting them in their alleged enfeebled condition for a long distance and over high altitudes. In view of their testimony showing the experience which they had severally had in handling cattle, we think that the trial court could not rightfully declare as a matter of law that they were incompetent to testify as experts, but are of the opinion that it was the province of the jury to determine, in the light of the experience which they professed to have had, what weight should be accorded to their testimony. The witnesses were certainly competent to express an opinion as to the condition of the herd, and we think that they were more competent than ordinary persons to judge of the probable effects of fatigue, and how they would be affected by a sudden change from a warm to a colder climate. The excluded evidence was fully as relevant and competent as some expert testimony which the plaintiffs were allowed to introduce, and we are unable to discover in the record any sufficient reasons for its exclusion. Nor are we able to say that the action of the court in excluding it was an immaterial error, which may be disregarded, in view of all the circumstances attending the trial, and the effect which the testimony might have had, if it had been admitted, on the assessment of the damages.

Counsel for the defendant have indulged in some criticism of the instructions which were given by the trial court, but no exceptions were taken to the instructions so given, except to the one which dealt with the measure of damages, and the exception in that behalf was very general, being merely, "We except * * * to the instruction given as to the measure of damages." Counsel, as it seems, did not attempt to point out to the court in what respect the instruction concerning the measure of damage was erroneous or misleading. In view of the provision in the special contract which required the damages, if any were claimed, to be adjusted on the basis of the value of the cattle at the place of shipment, and not to exceed the declared value at the time and place of shipment, the court in its charge gave the following directions, in substance, on the subject of damages: That in no event could the defendant be held responsible for any loss incident to the journey which resulted from the low vitality of the cattle, and was not induced by the carrier's negligence; that, if such negligence on the part of the defendant had been shown as entitled the plaintiffs to recover, the measure of damage would be the difference in value of the cattle at Caliente, Cal., on November 3, 1898, in the condition in which they were in fact delivered at Ogden, and

the condition in which they should have been delivered had the defendant used due care; that it was not any difference in the value of the cattle at Caliente as they were shipped and when they arrived at Ogden which was recoverable, but a difference due to the defend- ant's negligence, because some depreciation in value would necessa- rily result from the transportation of the cattle in a proper manner; that the value of the cattle in the condition in which they ought to have been delivered at Ogden and their value in the condition in which they were actually delivered should each be ascertained, the value in each instance being the market value at Caliente on Novem- ber 3, 1898, and that in no event could the value of the cattle in the condition in which they should have been delivered exceed $20 per head for grown animals and $5 per head for calves, because that was the maximum of value which was fixed by the special contract when the herd was received for shipment.

This part of the charge is criticised by counsel with a refinement of reasoning which is not usual, and, as we think, would not have been appreciated by the jury; for the reason, as counsel say, that in fixing the market value of the cattle at Caliente when they were de- livered for shipment the jury may have supposed from the language employed in one clause of the instruction that they were at liberty to place a higher value on the cattle than that fixed by the plaintiffs in the special contract, and that in this way the difference between the two values which was made the measure of damage might have been exaggerated. We do not think that the paragraph of the charge in question is fairly susceptible of such an interpretation; and we have no reason to suppose that it was interpreted by the jury as counsel assert that it might have been. The damages awarded certainly did not exceed the declared value of the cattle, for the sum allowed did not exceed $9 per head for grown animals. In view of all that was said by the court, we are satisfied that the rule for the admeasurement of damages was properly declared, and in language that was well under- stood.

The defendant's attorneys preferred numerous requests for in- structions, and excepted to the refusal of 11 of such special requests. But the instructions actually given embodied, as we think, the sub- stance of these requests, in so far as they enunciated correct proposi- tions of law. The issues whether there was unreasonable delay in transporting the cattle, in view of all the circumstances attending their transportation; whether the defendant furnished reasonable facilities for unloading the cattle, so that they need not have been kept on the cars longer than the statutory period; and whether the plaintiffs exercised proper care and diligence in availing themselves of such facilities or were remiss in the discharge of that duty, and by such neglect contributed to the injuries complained of,—were each clearly defined and fairly submitted to the jury; and these, in connec- tion with the issue respecting the physical condition of the cattle when delivered to the carrier, were the most vital issues in the case. Notwithstanding the complaint made by counsel that the court's charge was too general, we do not conceive it to be probable that the defendant was prejudiced by the refusal to give any of the special

requests, otherwise than as they were given in the general charge, since the jury were instructed, in substance, and in accordance with the view maintained by the defendant, that if the plaintiffs failed to exercise ordinary care in availing themselves of reasonable facilities which were afforded by the carrier for feeding, watering, and resting the stock at proper intervals, then they could not be heard to complain on that account. The defendant company was thus given the benefit of its plea of contributory negligence, in so far as that plea was supported by the proof.

Upon the whole, we conclude that the record discloses no material error other than the one heretofore pointed out, on account of which we deem it necessary to reverse the judgment, and direct a new trial. It is so ordered.

CALDWELL, Circuit Judge (dissenting). I concur in the opinion of the court on all points except the one upon which the judgment of the lower court is reversed. The competency of a witness to give opinion testimony depends upon either the actual experience of the witness with respect to the very subject-matter under investigation, or his previous study and research concerning the same, and sometimes on both. It is not claimed that the witnesses whose opinion testimony was excluded had made the subject of the effect upon cattle of a change of climate, or the effect upon them of transporting them by rail in any climate, a matter of special study or research. It is not shown that any one of them had any actual experience on the subject, or had personally observed the effect on cattle of a change from a warm to a cold climate, or that he had ever accompanied a shipment of cattle by rail at any time in any country. The general rule as to the admissibility of opinion testimony is well settled. In Railway Co. v. Edwards, 49 U. S. App. 52, 24 C. C. A. 300, 78 Fed. 745, this court said:

"The general rule undoubtedly is that witnesses are to testify to facts, and not to give their opinions; but this rule has its exceptions as familiar and well settled as the rule itself. The exceptions rest upon the common ground of necessity. Among these exceptions is this one: That a witness, having special knowledge and experience as to the value of property, animate or inanimate, and as to how the value of such property is affected by certain conditions or treatment, may give his opinion as to how much the property was damaged or benefited by such conditions or treatment. In many cases witnesses are allowed to testify to their opinions, not because they are 'experts,' in the technical sense of that term, but because they have special knowledge of the particular facts in the case, which the jurors have not. It is manifest that one who has never handled or shipped cattle by rail, and has never looked after and attended them while in the cars en route to their destination, can have no accurate conception of the effect upon cattle of confining them in cars standing still on the track for 10 or more hours, at the end of a long journey."

Not one of the witnesses testified that he knew from personal observation and experience the effect of cold weather on cattle in or out of the cars. The only experience they ever had with cattle was driving and herding them in southern California, a semitropical climate. They had no special knowledge derived from personal experience and observation, or otherwise, of the effect of cold upon cattle.

Their knowledge upon this subject was no greater than that of the average man and of every juror in the box. If their opinions were competent testimony, then the opinions of one who drives the cows from the pasture to the pen to be milked, and of the milkmaid who milks them, would be equally competent. The witness S. J. Root carried on a cattle business "in the state of California." He never shipped cattle to Nebraska, and is not shown to have accompanied a shipment of cattle over the mountains or elsewhere at any time, or ever to have crossed the mountains by rail. The experience of the witness George E. Root is limited to raising, feeding, and caring for cattle in four counties in southern California. He states expressly, "I never did travel with a train load of cattle." The witness Cuddy says he is a vaquero in three counties in southern California. He does not testify that he ever shipped any cattle by rail over the mountains, or that he ever accompanied any such shipment, or that he ever crossed the mountains by rail. The witness Dubbers testifies that he is familiar with the transportation of cattle in San Joaquin valley and in southern California. He does not testify to having shipped any cattle by rail over the mountains, or ever to have accompanied such a shipment, or ever himself to have crossed the mountains by rail. It is perfectly obvious that these witnesses had no special knowledge on the subject of the effect on cattle of shipping them by rail over the route traveled by the cattle in controversy in this case or any similar route. In a good many jurisdictions the ruling of the trial court on the competency of a witness to give opinion testimony is not subject to review (Rodg. Exp. Test, § 22), and in the jurisdictions where such ruling is reviewable it is only done where the court has committed a plain and palpable error in matter of law. This is the rule of the supreme court. In Manufacturing Co. v. Phelps, 130 U. S. 520, 527, 9 Sup. Ct. 601, 32 L. Ed. 1035, the supreme court say:

"Whether a witness called to testify to any matter of opinion has such qualifications and knowledge as to make his testimony admissible is a preliminary question for the judge presiding at the trial; and his decision of it is conclusive, unless clearly shown to be erroneous in matter of law."

This rule has been affirmed many times. In Iron Co. v. Blake, 144 U. S. 476, 484, 12 Sup. Ct. 731, 36 L. Ed. 510, the court said:

"How much knowledge a witness must possess before a party is entitled to his opinion as an expert is a matter which, in the nature of things, must be left largely to the discretion of the trial court, and its ruling thereon will not be disturbed unless clearly erroneous."

The reports of that court will be searched in vain for a case where the ruling of a lower court holding that the witness was incompetent to give opinion testimony has been reversed upon the state of facts disclosed by this record. Applying the rule of the supreme court to the testimony in this case, it is clear the lower court did not err. Its ruling was not founded on any error in matter of law. The lower court held that these witnesses were not shown to possess any special knowledge on the subject, or any knowledge above that of the average citizen. This was purely a question of fact to be de-

termined by the lower court, not only from the words of the witness, but from his presence, manner, and demeanor on the stand as well.

There is another view of the case which disposes of this alleged error. Facts within the knowledge of every man of common intelligence cannot be made the subject of opinion testimony. Jurors, as well as all men of common intelligence, know that cattle deprived of food for a long time will suffer from hunger, and that cattle taken suddenly from a warm to a rigorous climate will suffer from the cold, and it was only proposed to confirm these obvious and common truths by the opinions of these witnesses. As the observation and experience of these witnesses had been no greater than that of every farmer, ranchman, and dairyman in the land, they could rightfully testify to facts within their knowledge only, and not to their opinions. Moreover, there was a great mass of direct testimony on both sides showing the exact condition of the cattle at and before their shipment, and their treatment, condition, and action from the time they were placed in the cars until they were taken out at Ogden. The direct testimony on both sides covered every foot of ground and every hour of time from the time the cattle were placed in the cars until they were taken out at Ogden. The opinion, therefore, of these vaqueros, if competent, could not possibly throw any new light on the case or influence the verdict of the jury in the slightest degree. Their opinions, as disclosed by the record, were nothing more than the jury of their common knowledge, as well as from the direct testimony of the witnesses for both sides, already knew. At most, it was weakly cumulative of the direct and positive testimony of witnesses who accompanied the cattle on the train, and of the common knowledge of all men. The rejection of such opinion testimony, if error, was error without prejudice. The rule is well settled that, where a ruling either in admitting or rejecting evidence could not have influenced the verdict, the error is always to be regarded as harmless.

The judgment of the circuit court should be affirmed.